# EXHIBIT A

Our Ref:    NW/JSW/387020.00001
Your Ref:
Date:    28 May 2026



**birketts**
Next Level Law

The Honourable Judge
United States District Court
For the Southern District of Texas
Houston Division

Civil Action No. 4:24-cv-1001

Birketts LLP
Providence House
141-145 Princes Street
Ipswich
Suffolk IP1 1QJ

T    +44 1473 232300
F    +44 1473 230524

birketts.co.uk

UNSWORN DECLARATION UNDER PENALTY OF PERJURY OF NICHOLAS WOO

**Re : mv STRIDE – fire onboard at Houston, Texas on 4ᵗʰ January 2024**

I, Nicholas Woo, under the penalty of perjury under the laws of the United States declare as follows:

1.    I am a solicitor of England and Wales.   I was called to the Bar in Singapore in 1988 and admitted to the Rolls in England in 1996.   I am a partner in the shipping team at Birketts LLP and was head of that team from about 2006 to 2019.   My expertise during my nearly 40 years of practice, has been mainly in "dry" shipping law.  I have extensive experience in inter alia, charterparty disputes involving English law.

2.    Birketts LLP acts for Cosco (Cayman) Mercury Co. Ltd of the Cayman Islands ("the Charterers"), who chartered the mv STRIDE ("the Vessel") pursuant to a charterparty dated 12 August 2021 in an amended NYPE 1946 form ("the charterparty") from the registered owners Speedcarrier (No.3) Corp of Liberia ("the Owners") for a period "*minimum 34 months maximum 36 months exact period in Charterers' option.*"

3.    We are instructed that the Owners are in turn, beneficially owned by Danaos Corporation of the Marshall Islands (the "Beneficial Owners").   On or about 10ᵗʰ September 2023, the Beneficial Owners entered into an Amended and Restated Management Agreement ("the Management Agreement") with Danaos Shipping Company Limited of Cyprus ("the Manager") for inter alia, the technical management of the Vessel.

4.    The Vessel was delivered to the Charterers service on or about 7 March 2022.  The Vessel was sub-chartered by the Charterers to COSCO Shipping Lines Co. Ltd, the sub-charterers on a back-to-back basis.  For the purposes of this opinion, we will rely on the terms of the charterparty only.

Birketts LLP is registered in England under no. OC317545 and authorised and regulated by the Solicitors Regulation Authority no. 441849. Registered office at: Providence House, 141-145 Princes Street, Ipswich, Suffolk, IP1 1QJ. A list of members may be inspected at any of our offices. The term 'Partner' is used to refer to a member of Birketts LLP.

   

5.      Birketts LLP have been asked by Royston, Rayzor, Vickery & Williams, L.L.P. US Counsel for the Charterers, to give an opinion to this Court in answer to the following questions:

5.1      Under the charterparty, what are the Charterers' responsibilities, and obligations as time charterer of the Vessel, as it relates to vessel maintenance, crewing, crew training, and bunkering operations?

5.2      Does clause 2 of the charterparty, specifically the words *"(T)hat the Charterers, whilst on hire, to provide and pay for all the fuel except as otherwise agreed"* mean that the Charterers are responsible for receiving bunkers from the bunkering barge to the vessel's bunker tanks?

Brief Facts

We set out below a brief narrative of the relevant facts based, inter alia, on the undated Internal Investigation Report[1] ("the Report") prepared by the Managers.

6.      On 4 January 2024 the Vessel departed Puerto Barrios Guatemala, bound for Houston, Texas. She moored alongside Barbour's Cut Container Dock No. 5 of the Port of Houston on 7 January 2024.   On 8 January 2024, the Vessel initiated bunkering operations while still moored alongside.

7.      The Vessel is equipped with, inter alia and in relevant part:

7.1      Four bunker fuel tanks, three of which were nearly empty upon arrival;

7.2      Two double bottom diesel oil tanks, one port at 15% capacity upon arrival, and one starboard at 63% capacity upon arrival.

8.      A fire occurred on board the Vessel at 04:30 hours on 8 January 2024 in the machinery spaces in the engine room during bunkering operations while she was moored at Barbour's Cut Terminal in LaPorte, Texas.  The fire was tackled by the ship's crew with the help of the local fire department.   The fire was contained within the engine room and subsequently extinguished.  The engine room suffered extensive damage.  Unfortunately, two of the ship's engineers died and another engineer was seriously injured in the incident.

9.      The Report stated that the probable cause of the fire on board the Vessel was diesel oil cascading onto operating machinery in the engine room during bunkering.  An incorrect valve type installed into a diesel oil tank fill line prevented diesel oil from filling the tank and directed it up the common vent line, where it flowed from a cut out section of the vent pipe down into the engine room.  Engine crewmembers did not realize that they had installed the incorrect type of valve and were most probably unaware of the cut-out section of the vent pipe.

---

[1] Note that the Internal Investigation Report attaches the National Transportation Safety Board Report "Engine Room Fire aboard Cargo Vessel *Stride*".

10.     In addition, the Owners' bunkering procedures require a minimum of two engineering officers, two engine ratings, one deck officer and one A.B. to be on duty during bunkering operations. One of the tasks to be undertaken during the bunkering process on the vessel, was the frequent sounding of the bunker tanks and checking of the bunker flow rate.  This would have required the crewmember responsible for this task to be at the bunker tanks during the bunkering process.  However, at the time of the incident, it appears that there was not a crewmember assigned to monitor the tanks during the bunkering process or a crewmember in position to notice the overflow.

11.     Thirdly, a 7-inch-by-11-inch section of pipe had been cut into the top of a horizontal section of the 12-inch vent pipe on the D deck. The vent pipe ran from the lower engine room up to the compass deck. The Owners allege in the Report that they had no record of this alteration and no record of approval for this alteration; there were no records of inspections of this alteration; and the location of the missing section was not accessible and not visible from the paths commonly used by the crew. Staging would be required to inspect this point.

12.     Once the diesel oil reached the area of the vent piping with the cut out – which was affixed with a flexible sealant and tape - the diesel oil pressure in the pipe exceeded the capacity and ejected of vent pipe onto the deck below.  Diesel oil then poured out of the opening in the vent pipe and cascaded down through the funnel casing, onto the incinerator, the running boiler, the main engine, various lighting fixtures, operating equipment, and machinery.  The diesel oil ignited, resulting in a fire in the engine room.  The Report concludes that had the cut out not been present, the diesel oil would have likely exited the vent pipe on the compass deck and spilled onto the exterior of the vessel and into the water, rather than directly into the engine room, which contained operating machinery and other ignition sources.

13.     The Report also alleged that the barge supplying the bunkers was not equipped with deck lighting.  Illumination on the barge's main deck was provided by two floodlights mounted on the forward accommodation deck of the tug during night operations. It is alleged that this was insufficient lighting and it likely impaired visibility and hindered safe operations.  The Report also alleges that that the barge's pump flowrate was controlled by adjustment of the speed of the prime mover, which was equipped with an emergency stop mechanism, and the approximately 30-seconds delay in shutting down the pump suggests that the equipment may not have been in optimal working condition.  There is, however, no conclusion reached in the Report that either of these alleged defects were causative of the fire.

14.     The Report also confirms that there was no adverse information regarding the analysis of the bunkers delivered to the Vessel and therefore for the time being this factor is not considered as contributing to this accident.

Our opinion

Our opinion below sets out the interpretation of the Charterparty under English law (which governs the Charterparty pursuant to Clause 55) and we hope will be helpful to this Court.

Question 1 : Under the charterparty, what are the Charterers' responsibilities, and obligations as time charterer of the Vessel, as it relates to vessel maintenance, crewing, crew training, and bunkering operations?

15.    Clause 1 of the main body of the Charterparty sets out the Owners obligations under the charterparty as follows:

"*That the Owners shall provide and pay for all provisions, wages immigration, drinking water and consular shipping and discharging fees of the Crew and charges for port services pertaining to the crews; shall pay for all the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep the vessel in a thoroughly efficient state in hull, cargo space, machinery and equipment with all inspection certificates nevessary [sic] to comply with requirement at the ports of call and canals for and during the service and have a full complement of officers and crews*"

16.    Clause 2 of the main body of the Charterparty sets out the Charterers obligations under the charterparty as follows:

"*That the Charterers whilst on hire shall <u>provide and pay for all the fuel</u> except as otherwise agreed, Port Charges, Pilotages, compulsory garbage fees unless vessel has actually disposed of garbage in which case for Owners account, Towages, Canal dues customary, Agencies, Commissions, Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew or cargoes carried prior to delivery to be for Owner's account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more.*" (own emphasis)

17.    Clause 26 of the main body of the Charterparty states as follows:

"*Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, physical control and operation of the vessel and at all times acts of pilots and tug boats. insurance, crew, and all other matters, same as when trading for their own account*"

18.    We shall also be referring to various other provisions in the rider provisions of the Charterparty but for the sake of brevity will not set them out in detail here.

19.    Pursuant to Clause 1 of the Charterparty, Owners are responsible for:

19.1    All provisions;

19.2    Wages;

19.3    Immigration;

19.4     Drinking water;

19.5     Consular shipping and discharging fees of the Crew, and

19.6     Charges for port services pertaining to the crews;

20.     In addition, Clause 1 provides that the Owners shall pay for:

20.1     All the insurance of the vessel;

20.2     All the cabin, deck, engine-room and other necessary stores, including boiler water

21.     The Owners are also responsible for maintenance of the vessel's class and to keep the vessel in a thoroughly efficient state in hull, cargo space, machinery and equipment with all inspection certificates necessary to comply with requirement at the ports of call and canals for and during the service and have a full complement of officers and crews.

22.     In addition, Clause 26 of the Charterparty states that the Owners remain responsible for the navigation, operation, maintenance, crewing, and overall management of the vessel, pursuant to Clause 26.

23.     Clause 2 of the Charterparty while the Vessel is on hire, Charterers shall provide and pay for:

23.1     All the fuel except as otherwise agreed;

23.2     Port Charges;

23.3     Pilotages;

23.4     Compulsory garbage fees unless vessel has actually disposed of garbage in which case for Owners' account;

23.5     Towages;

23.6     Customary canal dues;

23.7     Agencies, Commissions, Consular Charges (except those pertaining to the Crew); and

23.8     All other usual expenses except those before stated, except if the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners.

23.9     Fumigations ordered because of illness of the crew or cargoes carried prior to delivery to be for Owners' account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers account. All

other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more.

24. It can be seen from paragraph 23 above that the Charterers' obligations are confined to those expressly allocated to them under the Charterparty, principally relating to the employment of the vessel, the provision of operational instructions, the allocation of costs, and certain risk and indemnity provisions.

## The Vessel's maintenance

25. The primary obligation to maintain the vessel in a thoroughly efficient condition rests with the Owners, as set out in Clause 1 of the Charterparty. This obligation is supported by authority. In *The Elli and The Frixos* [2008] 1 Lloyd's Rep. 262, it was held that once Owners become aware, or ought reasonably to become aware, of a deficiency, a duty arises to exercise reasonable care and skill to remedy the position.

26. Notwithstanding the above, Charterers assume responsibility for certain maintenance-related matters arising from their employment of the vessel. Where cleaning of cargo spaces is required because of cargo operations during the charter period, such cleaning, including the removal of residues, is for Charterers' account pursuant to Clause 43.

27. Further, under Clause 56, any stevedore damage affecting the vessel's class, seaworthiness, or cargo-carrying capability must be remedied immediately at Charterers' expense, with other stevedore damage likewise to be repaired at their cost. In addition, where loss or damage results from the improper securing of cargo within containers, Charterers are liable for the cost of repair and must indemnify Owners in respect of any resulting third-party claims, in accordance with Clause 62.

28. Clause 56 also requires that "*Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with up to date and complete certificates and approvals and equipment and fittings, enabling vessel and her crew to load, carry and discharge all cargoes permitted under this Charter party, and to receive bunkers*" (own emphasis).  This is a not uncommon provision where Owners usually warrant that all times, their vessel will have the necessary certificates to allow the vessel to trade.  These would include maintenance of the SMS.  Note also that the Owners are obliged to keep the vessel ready "to receive bunkers".

## Vessel's Crew

29. In relation to crewing, Clause 1 places primary responsibility on the Owners for the provision, payment and management of the crew. Owners further undertake that the Master will render the "*customary assistance*" of the crew, which typically includes cargo-related activities such as preparation of holds, hatch operations, and assistance with bunkering, as reflected in Clause 80.

30.     As a matter of law, it is an implied term that such services will be performed with reasonable care and skill, pursuant to section 13 of the Supply of Goods and Services Act 1982. Further, in *The Liepaya* [1999] 1 Lloyd's Rep. 649, it was recognised that the Master, officers and crew are under an implied duty to perform their services with due diligence

31.     However, Charterers bear responsibility for certain operational costs connected with the crew. Clauses 23, 63 and 80 provide that Charterers are liable for overtime where the vessel is worked continuously at their direction, and for costs associated with specific cargo operations, including reefer handling and lashing where the crew acts at Charterers' request.

32.     As to crew training, responsibility rests primarily with the Owners, who must ensure that officers are suitably qualified and competent for container operations, as set out in Clause 70.

<u>Bunkering</u>

33.     As a general principle, Charterers are under an obligation to order the vessel only to safe ports, and this obligation extends equally to ports nominated for bunkering. This was confirmed in *The Mediolanum* [1984] 1 Lloyd's Rep. 136 (C.A.).

34.     Further, where loss results from compliance with Charterers' bunkering instructions, Owners will ordinarily be entitled to an indemnity under Clause 8. This reflects the position that Charterers' bunkering orders are to be understood as encompassing the acts and directions of the nominated bunker supplier. However, such indemnity will not arise where the loss is properly attributable to crew negligence or to ordinary perils of navigation.

35.     In addition, and as mentioned above, pursuant to Clause 2, Charterers are responsible for the provision and payment of all fuel during the currency of the charter.

36.     This is distinct from the act of receiving bunkers from the bunker barge into the Vessel's bunker tanks as set out in clause 56.  The Vessel's crew would receive the bunkers. This is evident from the fact that the Managers publish a guide entitled "*All About Bunkering*" which sets out in detail, all the matters that the Vessel and its crew must be aware of when stemming bunkers. It is noteworthy that this document makes no mention of responsibility by the Charterers for this operation.

<u>General Provisions</u>

37.     Clause 89 titled "Liability Insurance" provides "(*T)he Charterers shall not be responsible for loss of life nor personal injury nor arrest or seizure or loss or damage to the vessel and /or other objects arising from perils insured by customary policies of insurance*".  This is another example of a provision delineating the responsibilities between Owners and Charterers.  In this case, the words are clear that Charterers are not to be responsible for inter alia, "*loss of life nor personal injury…arising by customary policies of insurance*"

Question 2 : <u>Do the words in clause 2 "(*T*)*hat the Charterers, whilst on hire, to provide and pay for all the fuel except as otherwise agreed*" mean that the Charterers are responsible for receiving bunkers from the bunkering barge to the vessel's bunker tanks?</u>

38. The short answer is "no" – see inter alia, paragraph 36 above.

39. It is helpful to consider briefly some of the authorities on the allocation of responsibilities in a charterparty.

40. In *McIver & Co. Limited v Tate Steamers Limited* [1903] 1 KB 362, the Court of Appeal considered the allocation of responsibility for seaworthiness under a time charterparty, specifically in relation to the supply of coal.

41. Under the charterparty, the owners retained responsibility for the vessel's general condition, including maintaining her in a "*thoroughly efficient state*", while the charterers were obliged to "*provide and pay for all the coal*" required for the voyage. The dispute arose when the vessel commenced on the return leg of the voyage with insufficient coal, rendering her unable to complete the voyage without deviation.

42. The owners argued that, because the charterers were responsible for providing coal, responsibility for the adequacy of the supply, and therefore seaworthiness in that respect, rested with the charterers.

43. The Court rejected this argument. It held that the contractual allocation of responsibility for supplying coal did not displace the owners' fundamental obligation to provide a seaworthy vessel at the commencement of each stage of the voyage. Seaworthiness extended to ensuring that there was a sufficient supply of coal on board, having regard to the ordinary incidents of the voyage.

44. In terms of allocation of responsibilities, the Court distinguished between:

44.1 the charterers' obligation to supply and pay for coal; and

44.2 the owners' overarching obligation to ensure that the vessel was seaworthy, including being adequately bunkered.

45. The Court further held that the owners could not rely on the charterers' obligation where the deficiency arose from the owners' own servants, in this case the chief engineer's failure to properly assess the quantity of coal required. The master (as owner's servant) was under a duty to provide accurate information to enable charterers to supply adequate coal.

46. Accordingly, the vessel was unseaworthy at the commencement of the relevant stage, and the owners were liable for the resulting loss. The appeal was dismissed.

47. In *AB Helsingfors Steamship Co Ltd v Rederiaktiebolaget Rex (The White Rose)* [1969] 1 WLR 1098, the arbitrators had to decide whether shipowners were entitled to recover from time

charterers, a contribution they had made towards settling a personal injury claim brought by a stevedore injured aboard the vessel.

48.     The vessel was chartered on the Baltime form. The charterers arranged for stevedores to load grain at Duluth, where a longshoreman (De Chambeau) fell through an unfenced hatch and was injured. The shipowners contributed US$3,000 towards a settlement and sought to recover this sum, together with costs, from the charterers under Clause 9 (indemnity for complying with charterers' instructions) or Clause 13 (liability for negligent cargo operations).

49.     The umpire found that the accident was caused partly by the stevedore's own lack of care and partly by the absence of fencing around the hatch, which constituted a breach of safety obligations incumbent on the owners. Importantly, the umpire also found that the charterers were not guilty of any improper or negligent act and that the accident was not caused by the owners complying with charterers' orders.

50.     The Court held that the Clause 9 indemnity requires proof that the loss was caused by compliance with the charterers' instructions, and that an unbroken chain of causation must be established. Although the loss arose while loading operations were carried out as ordered by the charterers, it was not caused by those orders. Rather, the effective cause lay in the absence of hatch fencing and local legal circumstances. Accordingly, the claim under Clause 9 failed.

51.     As to Clause 13, the Court accepted that the clause was wide enough to cover losses arising from reasonable settlements of potential liability. However, it only applied where the loss was caused by improper or negligent loading or other negligent acts of the charterers or their servants. As no such negligence was established, that claim also failed.

52.     The owners' claim was therefore dismissed in its entirety.

53.     In *C.V. Scheepvaartonderneming Flintermar v. Sea Malta Company Ltd (The "Flintermar")* [2005] 1 Lloyd's Rep. 405, the Court of Appeal (Civil Division) considered whether responsibility for a chief officer's personal injury lay with the owners or the charterers under a time charter on the Baltime 1939 form.

54.     The injury occurred during hatch-closing operations when the chief officer was thrown into the hold after a shore crane, operated by charterers' stevedores, lifted a pontoon prematurely. The trial judge found that the accident was caused by the negligence of the stevedores, although the system of work was unsafe.

55.     The central issue was the allocation of responsibility between owners and charterers for hatch operations and cargo handling. The Court confirmed that, as a starting point, hatch handling is ordinarily the owners' responsibility, since hatches form part of the vessel's equipment and are operated using the vessel's own machinery. However, clauses placing responsibility for

loading and discharging on charterers meant that cargo operations were primarily within the charterers' sphere.

56.     The Court emphasised that liability depends on the proper characterisation of the particular operation. Applying the "practical test" from *The Azuero*, the question is whether the relevant activity is part of, or sufficiently connected with, the cargo operation. On the facts, hatch handling had become part of the cargo operation because: it was performed by charterers' stevedores; it formed an integral part of loading and discharging; it was carried out under an established operational "accord" between the parties; and no additional payment was made by the owners.

57.     The Court rejected arguments that responsibility reverted to the owners via the master's overarching authority, holding that the master's responsibility concerned decision-making, whereas execution of cargo operations remained with charterers. Causation was also resolved in favour of the owners: the effective cause of the accident was the stevedores' negligence, not the unsafe system of work.

58.     Accordingly, the appeal was allowed. The charterers were held liable in damages for breach of contract and required to indemnify the owners for the settlement paid to the injured officer.

59.     In *Onego Shipping & Charterering BV v JSC Arcadia Shipping (The Socol 3)* [2010] 2 Lloyd's Rep 221, the Commercial Court addressed the allocation of responsibility between owners and charterers under a time charter following the loss of deck cargo. The vessel was chartered on the NYPE 1993 form, under which charterers bore primary responsibility for cargo operations, including loading, stowage and lashing, "at their risk and expense", albeit under the supervision of the Master.

60.     The tribunal found that the casualty resulted from three effective causes: poor stowage, deficient lashing, and the vessel's instability. As a rule, responsibility for cargo operations lies with the charterers, even where the Master supervises those operations. However, the Court confirmed two well-established exceptions derived from Court Line: responsibility shifts to owners where (i) the Master intervenes in cargo operations and causes the loss, or (ii) the loss arises from matters within the vessel's exclusive knowledge, such as stability.

61.     On the tribunal's findings, the instability of the vessel, a matter within the owners' knowledge, rendered the vessel unseaworthy. Accordingly, owners were contractually responsible for that aspect of the loss, notwithstanding the charterers' primary duty for stowage.

62.     The Court also held that the Hague-Visby Rules, though incorporated, did not apply to the deck cargo because the relevant "contract of carriage" for the purposes of article I(c) was the bill of lading, not the charterparty, and the exclusion for deck cargo therefore applied.

63.     Crucially, the Court rejected the tribunal's construction of clause 13(b). Applying the *Canada Steamship* principles, it held that the clause did not clearly cover negligence or

unseaworthiness. Instead, it only indemnified owners for losses effectively caused by the inherent risks of carrying deck cargo, not for losses caused by owners' negligence or breach of seaworthiness obligations.

64. Since the effective cause of the loss was owners' negligence and unseaworthiness, the indemnity did not apply. The appeal was therefore allowed.

65. From the above, the words in clause 2 that the Charterers are to "**provide and pay for all the fuel**" allocate the cost and procurement responsibility for bunkers to Charterers, but do not transfer responsibility for the physical operation of bunkering. The Charterparty follows the orthodox time charter division: Owners retain responsibility for the vessel's navigation, operation, machinery and crew under clauses 1 and 26, including the conduct of onboard operations by the crew. Receiving bunkers into the vessel's tanks is an operational task involving the vessel's systems and engineering crew and therefore falls within the Owners' sphere of responsibility.

66. The authorities support a strict distinction between supply obligations and operational control. The court in *McIver v Tate Steamers* held that charterers' obligation to supply fuel did not displace owners' responsibility for seaworthiness and proper management of that fuel aboard the vessel.  Similarly, cases such as *The White Rose* and *The Socol 3* emphasise that liability turns on the nature of the operation and causative control, with Owners remaining responsible where the act in question concerns shipboard management, crew acts, or matters within their exclusive domain.

67. Accordingly, while Charterers must procure and pay for bunkers and may nominate suppliers, Owners remain responsible for how bunkering is executed onboard, including the receiving process, monitoring, and safe handling by the crew. Clause 2 does not extend to transferring operational responsibility for receiving bunkers from the bunker barge to the vessel's tanks, which remains part of the Owners' retained obligation to manage and operate the vessel safely.

68. There is also an arguable case that the vessel was prima facie unseaworthy. The Charterparty is clear that it is Owners' obligation to maintain a seaworthy vessel.  Mr. Justice Channel in *McFadden v Blue Star Line* [1905] 1 K.B. 697 established that a seaworthy ship is one that a "prudent owner" would require his vessel to have at the start of her sailing, considering the circumstances and foreseeable perils of the voyage (commonly referred to as "the prudent owner" test).

69. As can be seen in paragraphs 9 to 12 above, the vessel was defective in that:

69.1 An incorrect valve had been installed by the vessel's crew, in the bunker oil tank line causing the bunkers to overflow into the vent pipe;

69.2 The vessel's crew failed to properly monitor the bunkering process and as a result, did not notice - when they should have - that the bunkers were overflowing; and

69.3     The vessel had an unauthorised and unapproved modification to the vent pipe which caused the overflowing bunkers to fall back into the engine room.

No prudent owner would have allowed his vessel to depart from the port with these defects all of which, per Owners' Internal Investigation Report, caused and/or contributed to the fire. There is therefore, in our view, a strong argument that the vessel's unseaworthiness caused the fire.

70.     Please find attached hereto a copy of my C.V. I am being compensated at the rate of GBP430 (about USD578) per hour associated with preparing this Declaration and possible testimony in this case. I have not authored any publications in the last 10 years and have not testified as an expert at trial or by deposition in the previous 4 years.

## Conclusion

71.     Taking into consideration the facts set out above and the allocation of responsibilities under the Charterparty, it is our view, for the reasons set out above, that the Charterers are not responsible for the fire.

I, Nicholas Woo, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Yours sincerely



**Nicholas Woo**
**Partner**
**For and on behalf of Birketts LLP**

Direct Line:           01473406368
Direct e-mail:          nicholas-woo@birketts.co.uk



**Partner**

+44 1473 406368
+44 7775 915497
nicholas-woo@birketts.co.uk

Nicholas is a Partner in our Shipping and International Trade Team and an accredited CEDR (Centre for Effective Dispute Resolution) Mediator.

He has nearly 40 years' experience in the shipping legal industry. Nicholas grew up in Singapore, obtained his LLB in England and was called to the English Bar in 1986. He qualified in Singapore as an Advocate and Solicitor the following year and practised in Singapore as a shipping litigator for five years. He then moved in-house working for a COSCO Singapore subsidiary where he gained valuable commercial experience. London beckoned and Nicholas qualified as an English solicitor in 1996. He was made a Partner in 2001, the first ethnic Chinese to be appointed as a partner in a major shipping law firm in London before joining Birketts.

Nicholas is a specialist in all areas of 'dry' shipping litigation with particular knowledge of shipping in Singapore, Korea, Taiwan, Hong Kong and China. He also has some contacts with the Indian and Japanese shipping industry. He makes regular visits to these countries every year. Working for COSCO Shipping and spending many years representing other Chinese clients has helped Nicholas develop his ability to take instructions, give advice and lecture on English shipping law in fluent Mandarin.

Nicholas used to sit on the Supporting Members Liaison Committee of the London Maritime Arbitrators Association. He has also previously undertaken a number of key roles in the industry, including chairing the time charterparty and cargo claims seminars organised by the Lloyds Maritime Academy in London and representing the Singapore Shipping Association at the Maritime Law Committee of the International Chamber of Shipping. Nicholas is a past President of the Singapore Business Group, a Singapore-British business networking group in London under the patronage of the Singapore High Commissioner to London. He has recently been appointed as an Advisor to the Chinese Shipping Association in London supported by the Baltic Exchange.